MOORE ET AL VS GIRTEN.

Opinion delivered October 19, 1904.

1. *Indian Lands—Quapaws—Leases—For Period Longer Than Three Years, Valid.*

Under the treaties with the Quapaw Indians (Nov. 15, 1824-7, Stat. 232; May 13, 1833, 7 Stat. 424) and the Acts of Congress relating to the lands of such tribe (Ind. Appro. Bill, 1895, 28 Stat. 907; Ind.

Appro. Bill, June 7, 1897, 30 Stat. 7) there is no prohibition against patentees leasing their lands for any term and other alloted lands may be leased for three years.

2. *Forcible Entry and Detainer—Indian Lands—Lease—Evidence.*

Under Sec. 3365 Mansf. Dig. (2299, Ind. Ter. Stat.) providing that in actions of forcible entry and detainer, title to the lands in controversy can only be given in evidence to show the right to possession, a valid lease of Indian lands and an assignment thereof, under which one party claims, are competent evidence.

3. *Forcible Entry and Detainer—Instructions.*

An instruction, requested by defendant in an action of forcible entry and detainer, charging the jury that the gist of the action is the forcible taking of the actual possession of the premises was properly refused, as, under Sec. 3347 Mansf. Dig. (2281 Ind. Ter. Stat.) the forcible holding, alone, of possession, is ground for the action.

4. *Instructions—Non-Prejudicial—Not Error.*

Where instructions complained of, even though erroneous, were prejudicial only to the appellee, the appellant cannot be heard to complain.

Appeal from the United States Court for the Northern District.

JOSEPH A. GILL, Judge.

Action by George Girten against James K. Moore and another. Judgment for Plaintiff. Defendants appeal. Affirmed.

On July 11, 1901, the appellee (plaintiff below) filed his complaint in an action of forcible entry and detainer. Bond by plaintiff and cross-bond by appellants defendants below was filed in the sum of $2,000. Afterwards defendants filed demurrer, and plaintiff thereupon filed amended complaint, and alleged

that on June 28, 1901, plaintiff was in the actual and peaceable possession of certain lands lying in the Quapaw Reservation, Ind. Ter., amounting to 590 acres; that defendants, "with force and strong hand, and armed with weapons, and by threats to beat plaintiff," and by frightening plaintiff to yield possession, did enter upon said land, and did hold the same by actual force and violence, and continue unlawfully to hold same after lawful demand in writing for the delivery of possession. Plaintiff asks for judgment for possession and damages in the sum of $2,500. On January 22, 1902, defendants filed their joint answer, and deny that plaintiff was in possession as alleged, and deny that they entered upon said land by force as alleged; deny that plaintiff is entitled to any damages whatever; deny that they were ever in possession of 200 acres of the land described by plaintiff, and, as to balance of land, say that on March 3, 1898, defendant Dardenne, for himself and his minor children, leased the lands mentioned to one Clinton A. Childs or his assigns for three years from that date; that afterwards said Childs assigned said lease to plaintiff, and plaintiff entered under it; said lease provided that Childs, or his assigns, should surrender peaceable possession at the expiration of the term, or for any failure to comply with the terms of the lease; that, after the expiration of the term, defendant Dardenne peaceably and quietly re-entered and took possession, and the defendants were in the quiet and peaceable possession of the premises at the time of the occurrence of the acts complained of in this suit. Defendants say they are not guilty of a forcible entry and detainer, and asks that plaintiff's complaint be dismissed. On January 23, 1902, said case came on for trial before a jury, and on January 24, 1902, the jury returned their verdict, as follows: "We, the jury, find the issues for the plaintiff, and that defendants are guilty of a forcible entry and detainer of the lands sued for, viz., the hay land on the E. ½ of the S. E. ¼ section 34 and on section 35 in T. 29 north, of range 22, in the Quapaw Reservation, Indian Territory, and we

assess the damages of the plaintiff at $590." On same day a motion for new trial was filed by defendants, and the court continued this case until the next term of court. On October 22, 1902, motion for new trial was heard and overruled, to which defendants except, whereupon the court rendered judgment as follows: "Whereupon it is by the court considered, ordered, and adjudged that the said plaintiff, George Girten, do have and recover of and from the said defendants, Jas. K. Moore and Lawrence Dardenne, the sum of five hundred and ninety (590) dollars, together with interest thereon at the rate of six per centum per annum from this date, and all of his costs in and about this action laid out and expended, taxed at ———— dollars and ———— cents, and that he have execution therefor. It is further ordered by the court, upon the application of the said defendants, that they be given thirty days from this date in which to file a supersedeas bond in this action, and that no execution issue upon said judgment for said period of thirty days." Defendants executed a supersedeas bond and appealed to this court.

*S. C. Fullerton* and *Geo. B. Denison*, for appellants.

*J. A. Pope* and *W. H. Kornegay,*, for appellee.

TOWNSEND, J. The appellants have filed seven specifications of error. The first was the admission in evidence of a lease and a receipt, which lease had been duly executed by appellant Dardenne to Childs, assignor of appellee, of the premises in controversy, on the 3d day of March, 1898, for a period of two years, commencing on the 1st day of March, 1901, which had been assigned to appellee, as follows: "Baxter Springs, Oct. 10, 1899. For and in consideration of the sum of one dollar, the receipt of which is hereby acknowledged, I do hereby assign all my right, title and interest in and to the within lease, to George

Girten or bearer.   Clinton A. Childs."   The rent reserved in said lease was $175, to be paid semiannually—the first payment to be made March 1, 1901, and same to be made to Lillian Dardenne—and the receipt was as follows: "Baxter Springs, Kans., Oct. 9, 1900.   Rec'd from C. A. Childs one hundred seventy-five dollars in payment of lease to September 1st, 1901.   Lillian Dardenne."

Appellants' objections to the admission of this lease were because it was incompetent, irrelevant, and immaterial, "because it appears to have been made to take effect at the expiration of the prior lease, or at a future date, which, with the prior lease, would exceed the time allowed by law to lease these Indian lands in the Quapaw Agency," and because it is not referred to in the answer, and therefore is not competent and relevant; and their objection to the admission of the receipt is "because wholly incompetent, irrelevant, and immaterial, because it did not appear from the paper that it was ever given by either of the parties defendant in this suit."   The reasons the trial court gave for the admission of this lease are as follows:   "In the opinion of the court, leases of land in the Quapaw Agency can only be made for a determined time, and must comply with the law with reference to limitations of time, and parties taking farming leases for a longer time than that stipulated by the statute, or any attempt to evade the law in reference to the length of term, gives them no rights whatever as against the lessors when the lessors endeavor to repossess themselves of the premises; but where the lessor allows the term to go on under the new lease, where such lease has been executed, and the party gets actual possession, the lessor may, under such circumstances, be concluded for a one-year term as to that part of the land.   In this case the testimony of the plaintiff is that he held possession of these lands under this assigned lease as the tenant of Dardenne from the date of this proposed assignment, but the lease and receipt

would seem to be contradictory of this state of the case. The payment of the money seems to have been by Mr. Childs, and not by the plaintiff in this action. It seems to have been made in October, 1900. These are questions which, under the direction of the court, will be allowed to go to the jury as matters of fact, and the objection to this lease will be overruled at this time and the defendants are allowed an exception. You may introduce the lease and the receipt." It was shown by appellants' answer: That a lease was executed on the same date as the above-mentioned lease between the same parties for the same premises for a term of three years, and that the above-mentioned two-year lease was to commence in the future, and at the expiration of the lease for three years. The assignment to appellee was in October, 1899, and before the expiration of the lease for three years. That he entered into possession under said three-year lease, and was in possession when the two-year lease began. But it is claimed by the appellants that a lease of these lands for a longer period than three years is illegal, and appellants served notice on Childs, appellee's assignor, as follows:

"C. A. Childs: You are hereby notified that I have this 29th day of April, 1901, re-entered and taken possession of the East half (½) of the Southeast quarter (¼) of section 34 and all of section 35 of T. 29 R. 22 of Quapaw Reserve, I. T., and that all leasehold rights and interests that may have heretofore been claimed by you in said lands are this day terminated because:

"1st. Noncompliance with the terms of the lease and great waste and failure to take proper care of the premises and great damage to said premises.

"2nd. Illegality of the lease executed March 3rd, 1898, for the term of two years beginning March 1st, 1901.

"And I further notify you that you do vacate said premises and remove therefrom within thirty days from this date.

"LAWRENCE DARDENNE,

"Personally and as guardian of his minor children."

It thus appears that one of the reasons given for re-entry was the "illegality of the lease executed March 3rd, 1898, for the term of two years beginning March 1st, 1901." The appellee contending this lease was valid, it was in consequence necessarily put in issue on the trial of this case. The appellants object to the ruling of the court on the ground that, while the court declared the two-year lease void, because, in effect, the two leases, taken together, leased the land for a longer period than three years, and was simply a device to violate the statute, which the court insisted applied to the premises in question, yet the court admitted the lease and receipt, as the appellants insist, upon the theory that a void lease could be ratified and made good for a period of one year. Appellants contend this is not the law, and cite authorities to show that a "void contract cannot be ratified." Appellants are unquestionably correct in their contention that if the lease executed March 3, 1898, for two years, to begin March 1, 1901, was void, it could not be ratified, for the reason that void contracts cannot be ratified. But was the court, and are appellants' counsel, correct in the assumption that the limitation of three years for the leasing of lands applied to the lands in controversy in this case? By a treaty entered into November 15, 1824 (7 Stat. 232), between the United States and the Quapaw Nation of Indians, it was provided:

"Article 1. The Quapaw Nation of Indians cede to the United States of America, in consideration of the promises and stipulations hereinafter made, all claim or title which they may have to lands in the territory of Arkansas, comprised in the following boundaries, to wit: Beginning at a point on the Arkansas river, opposite to the post of Arkansas, and running

thence a due southwest course to the Ouachita river; and thence, up the same, to the Saline Fork; and up the Saline Fork, to a point from whence a due northeast course will strike the Arkansas river at Little Rock; and thence down the right (or south) bank of the Arkansas river to the place of beginning."

"Article 4. The Quapaw tribe of Indians will hereafter be concentrated and confined to the district of country inhabited by the Caddo Indians, and form a part of said tribe. The said nation of Indians are to commence removing to the district allotted them, before the twentieth day of January, one thousand eight hundred and twenty-six."

That subsequently, on May 13, 1833, by another treaty between the United States and the Quapaw Indians (7 Stat. 424), it was provided as follows:

"Whereas, by the treaty between the United States and the Quapaw Indians, concluded November 15th, 1824, they ceded to the United States all their lands in the territory of Arkansas, and according to which they were 'to be concentrated and confined to a district of country inhabited by the Caddo Indians and form a part of said tribe,' and whereas they did remove according to the stipulations of said treaty, and settled on the Bayou Treache on the south side of Red river, on a tract of land given them by the Caddo Indians, but which was found subject to frequent inundations on account of the raft on Red river, and where their crops were destroyed by the water year after year, and which also proved to be a very sickly country, and where in a short time nearly one-fourth of their people died, and whereas they could obtain no other situation from the Caddoes and they refused to incorporate them and receive them as a constituent part of their tribe as contemplated by their treaty with the United States, and as they saw no alternative

but to perish if they continued there, or to return to their old residence on the Arkansas, they therefore chose the latter; and whereas they now find themselves very unhappily situated in consequence of having their little improvements taken from them by the settlers of the country; and being anxious to secure a permanent and peaceable home the following articles or treaty are agreed upon between the United States and the Quapaw Indians by John F. Schermerhorn. * * * Commissioners of Indian Affairs West, and the chiefs and warriors of said Quapaw Indians this (13th) thirteenth day of May, 1833:

"Article 1. The Quapaw Indians hereby relinquish and convey to the United States all their right and title to the lands given them by the Caddo Indians on the Bayou Treache of Red river.

"Article 2. The United States hereby agree to convey to the Quapaw Indians one hundred and fifty sections of land west of the state line of Missouri and between the lands of the Senecas and Shawnees, not heretofore assigned to any other tribe of Indians, the same to be selected and assigned by the Commissioners of Indian Affairs West, and which is expressly designed to be (in) lieu of their location on Red river and to carry into effect the treaty of 1824, in order to provide a permanent home for their nation; the United States agree to convey the same by patent, to them and their descendants as long as they shall exist as a nation or continue to reside thereon, and they also agree to protect them in their new residence, against all interruption or disturbance from any other tribe or nation of Indians or from any other person or persons whatever."

It does not appear that any limitations were placed upon the power to lease any of the lands described in this treaty. By the Indian appropriation bill of 1895 (28 U. S. Stat. 907), it is

provided "that the allotments of land made to the Quapaw Indians, in the Indian Territory, in pursuance of an act of the Quapaw national council approved March twenty-third, eighteen hundred and ninety-three, be and the same are hereby ratified and confirmed, subject to revision, correction and approval by the Secretary of the Interior: provided, however, that any allottee who may be dissatisfied with his allotment shall have all the rights to contest the same provided for in said act of the Quapaw national council subject to revision, correction, and approval by the Secretary of the Interior. And the Secretary of the Interior is hereby authorized to issue patents to said allottees in accordance therewith: provided, that said allotments shall be inalienable for a period of twenty-five years from and after the date of said patents: and provided further, that the surplus lands on said reservation, if any, may be allotted from time to time, by said tribe to its members, under the above entitled act." It appears that the lands are to be patented to the allottees, subject to the restraint that they shall be inalienable for 25 years. The foregoing contain the only restrictions applicable to the Quapaw Indians. The Indian appropriation bill of June 7, 1897 (chapter 3, 30 Stat. 72), contains an appropriation for the Quapaws as follows: "Quapaws. For education, during the pleasure of the President, per third article of treaty of May thirteenth, eighteen hundred and thirty-three, one thousand dollars; for blacksmith and assistants, and tools, iron, and steel for blacksmith shop, per same article and treaty, five hundred dollars; in all, one thousand five hundred dollars." The same act also contains provisions enabling the allottees of land in the Quapaw Agency to lease their lands for the term of three years. There is no prohibition against the Quapaw Indians leasing their lands, which they hold by patent; and as the Quapaw Agency embraces numerous tribes, which hold by almost as many different tenures as there are different tribes, the provision as to leasing authorizes and enables those which at that time

were unable to lease to do so for a three-year term. It thus appearing that the lease was good, it was therefore proper for appellee to show his right to possession, and the extent thereof.

In the action of forcible entry and detainer, the statute, section 3365 (Ind. Ter. St. 1899, § 2299), provides as follows: "In trials under the provisions of this act, the title to the premises in question shall not be adjudicated upon or given in evidence, except to show the right to possession and the extent thereof." Hence it became very material for appellee to make this proof, and, if the court erred in his ruling, it was in favor of the appellants, and not the appellee.

The second assignment of error is as follows: "The court committed an error of law in refusing to give in charge to the jury the law as asked by the appellants in the following instruction: 'In this case the jury are instructed that the gist of the action is the forcible taking of the actual possession of the premises sued for from the plaintiff by the defendants in the manner charged in the complaint, or by some of the means therein charged; and the jury, if they are satisfied by a fair preponderance of the evidence that one of the defendants so took possesion, and that the other defendant had nothing whatever to do with that taking possession, they may find a verdict against one defendant and for the other defendant, and, if the jury believe from a fair preponderance of the evidence that neither of the defendants took from the plaintiff such forcible possession of the premises, their verdict should be for the defendants.' Which error of the court was duly excepted to at the time." The appellee alleged that appellants, after entering upon said premises, "did hold the same by actual force and violence," and the statute (section 3347, Mansf. Dig.; Ind. Ter. St. 1899, § 2281) provides as follows: "If any person shall enter into or upon any lands, tenements or other possessions, and detain or hold the

same with force and strong hand, or with weapons, or breaking open the doors and windows or other parts of the house, whether any person be in or not; or by threatening to kill, maim or beat the party in possession; or by such words and actions as have a natural tendency to excite fear or apprehension of danger; or by putting out of doors or carrying away the goods of the party in possession; or by entering peaceably and then turning out by force; or frightening by threats or other circumstances of terror the party to yield possession; in such case every person so offending shall be deemed guilty of a forcible entry and detainer within the meaning of this act." It thus appears that any person who shall enter into possession of premises, and detain or hold the same with force and strong hand, or with weapons, is guilty of a violation of the statute, while this instruction tells the jury that the gist of the action is the "forcible taking." The instruction is not broad enough. Besides, the action was for possession, and persons claiming under the person who holds by force have no greater claim to possession than he. We do not think the court erred in refusing the instruction requested.

The third and fourth assignments of error were the refusal of the court to give certain charges requested by appellants. It is admitted by them, however, that, had the court not committed grave errors in other parts of his charge, and which are discussed under other assignments, there would have been no error in refusing these requests. We therefore deem it unnecessary to further refer to these specific assignments.

The fifth assignment of error was the giving of certain charges to the jury, to which appellants interposed objections and saved their exceptions. Under this assignment, appellants again insist that a void contract cannot be ratified, and cite additional authorities to sustain that contention; but this court, entertaining the opinion that the two-years lease was valid, and

not void; that the lower court itself, as well as appellants, were mistaken at the time in holding that the three-years limitation on leases applied to the premises in question; that appellee consequently was lawfully in possession through his tenant—it is therefore perfectly evident that the only effect of the instructions given would be prejudicial to the appellee, and not to appellants, and they could not reasonably complain.

The sixth assignment of error was the refusal to grant a new trial, and the seventh assignment was entering judgment for appellee on the verdict. We think the court was justified in letting the verdict stand. Therefore the judgment of the lower court is affirmed.

RAYMOND, C. J., and CLAYTON, J., concur.